The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to draw nine, give their attention, for the court is now sitting. God save the United States and this Honorable Court. Morning everybody. Welcome to the United States Court of Appeals for the 4th Circuit. We're going to have three cases on for argument this morning. First up is United States v. Davis. Counsel, whenever you're ready. May it please the court. My name is Robert Wagner. I represent the appellant in this case, Mr. Richard Davis. I want to point out that Mr. Davis is actually here. He's in the back of the wheelchair in the back, and he wanted to be here to make sure that justice is served in his case. He asks that his convictions be reversed. Judge, we present four issues before the court today, and I'd like to begin with the issue identified by the court in its description of the case. That's the issue of knowledge, of whether the district court erroneously found that the health care fraud offenses. Now, from the opening brief, Mr. Davis made clear that, according to the United States Supreme Court, a person acts knowingly if they act with knowledge of the facts that constitute the offense. That's Dixon v. United States. This court, in the United States v. Moody, a 2021 case, also identified knowingly as merely requiring proof of knowledge of the facts that constitute the offense. So, can I ask you about that, Mr. Wagner? With respect to that element of knowledge, is it your position that Mr. Davis needed to know every minutiae of every one of the incidences that the United States alleged constituted fraudulent claims, or as I think the government would frame it, he simply needed to have initiated, put the wheels in motion to allow the specific offenses to happen? He didn't need to have knowledge of each and every element of each of the separate counts. Which one is it? Well, Judge, that he had specific knowledge. Of what? Of the claims that were submitted. That's the standard. Each individual county needed to know that each health care professional on a particular day committed a fraudulent act? That's correct, Judge. I think that's the standard that has been articulated by the 10th and 11th circuits that we asked this court to adopt, but it's also the standard that the government itself established in the indictment. In the indictment, the government said, as Mr. Davis well knew, these claims were false. These claims were fraudulent. Well, I guess their position is that he well knew that he had brought to fruition a scheme that would have led the billing of false claims against the government. That's what I understand their position to be. Well, I understand that position, Judge, but we've also attacked the schema artifice to defraud. We've laid out in our briefing that in this particular case, you've got a situation where the people who are providing the services, the counselors, were providing at least five hours a day of reimbursable services. You heard from just about every witness in the case. Isn't that a factual question for the district court? It is, Judge, but certainly this court reviews the factual determinations of the district court. Well, why do you say that there's a men's ray is absent here? It seemed to me that the case bottomed out on whether he knew that he was billing Medicaid for services that fell short in two respects. One, that the services were never undertaken. They just weren't performed. The other was that he was misbilling for things like planning, which were not reimbursable. One of two things. Number one, that the services were never provided and he was billing for services that were provided were not reimbursable, but they were still reported nonetheless. And if he knew that he was doing these things, which essentially was ripping off the Medicaid program, how can you possibly contend that there was no men's ray here? Because it seems to me that's, you know, pretty much garden variety fraud. And if you know that you're essentially lying to the government and seeking money and seeking reimbursements for something you never once did, and why isn't, isn't this really, we can talk about specific intent and this and that and try to get all wound up about those things. But it comes down to a basic point. He was, he was billing the government for something to reimburse him for something that he'd never performed and something that was not reimbursable. And so why is there a men's ray problem here? Judge, I think this, this comes down to some very foundational points that we've raised in our briefing that we raised before the district court. The foundational points are first and foremost as to the scheme of fraudifice to defraud, which I was trying to explain before that each of these counselors testified at trial that they provided at least five hours a day of reimbursable services. But aren't, isn't, aren't we under a clearly erroneous standard with respect to those, those are, those are factual findings as to whether the, the two witnesses, Bill and um, Larry, the, the, the question is to whether they were credible, um, and who thought what, isn't that all factual for the district court to, to address? That's not, that's not the province of the court of appeals. The records, I believe, speak for themselves, Judge. Um, the records show that these, these hours were reported and then the witnesses themselves never claimed for each of Ms. Loney. So, but you're, you're asking us, aren't you asking us to say the district court heard in finding Bill and, um, Loney to be incredible witnesses when, when the district court heard them and we, we haven't. Um, I mean, there's a, there's gotta be a, it's a bench trial, it's true, but deference belongs to a bench trial the same way it would belong to, um, jury trial. And, um, there seems to, I would think that in the assessment of the credibility of Bill and Loney, um, as to whether they were telling the truth, as to whether they were credible witnesses, um, their, their testimony is very damaging to you, very damaging. Um, to the problems with, um, uh, you're curious to each of these two key witnesses. Um, but the point I'm making is that we have a district judge here who, who listened to these people and the case seemed to me to rise and fall on the testimony of Bill and, and, and Loney. And we have a district court that listened to them both and made factual findings and assessments. Uh, and, and we're up here and those two witnesses are nowhere to be found in this room. And, um, I don't understand why we can try to make it complicated, but I don't understand why at its core, there's not a certain simplicity to it. Judge, I believe that we have in fact satisfied the clearly erroneous standard. And I would take issue with the court's comments that these witnesses testified that they didn't perform the required hours here. To follow up on that very point and to follow up on Judge Wilkinson's good questions. So there were six counts, right? That were alleged against your client. Yes, Your Honor. He was acquitted of four of them. That's correct. Convicted of two. Yes, sir. And the two counts dealt with two very specific dates, April the 30th, 2018, May the 9th, 2018. Yes, sir. And so, you know, there are, there's a lot of atmospherics in this case about group billing and all other kinds of shenanigans. But the key question is that the government presents sufficient evidence to prove beyond a reasonable doubt that on those two dates, these counselors falsely billed Medicaid beyond the three units that they were authorized to bill. Right. And frankly, I had a hard time in the finding of the record evidence that those counselors testified to those facts. That they actually billed erroneously, falsely on those two dates. Isn't that what this case is about? If I'm understanding your question correctly, I don't believe either of those witnesses testified. I mean, they suggested that there were all kinds of shenanigans going on. And that generally, as a matter of fact, they were directed to bill in excess of what Medicaid would have allowed as a general principle. And that's, that's concerning. But the question is, did the government prove beyond a reasonable doubt that on these two dates, these counselors filed fraudulent bills? And I've, you know, that's a question for your colleague on the other side. But right now, I have a difficult time seeing in this record where that evidence is. Well, we did too. And can we start with count three? I'm sorry. Can we start with count three? Certainly. Sure. That's the one involving Cassie Yes. Yes, sir. Don't her progress notes that day indicate that time was spent on planning and no indication that it was spent on something that's reimbursable? Why isn't that sufficient evidence on count three? I'm sorry. So are you asking? The progress notes don't indicate that she spent any reimbursable time on the date covered by count three. Why isn't that sufficient evidence that she didn't do any reimbursable time on that date? My reading of the record is that she spent a considerable amount of time with counseling of the client on that particular. What if I read the record as saying that she admitted that not what she testified, what her progress notes say. Yes. That her progress notes do not indicate that she spent any reimbursable time on the date covered by count three. And I know maybe she testified to something different, but in terms of sufficiency, why isn't it pretty damning evidence that your contemporaneous records of what you did that day don't indicate that you spent any time doing anything reimbursable that day? Again, maybe a fact finder could come up with a reason why there's an explanation, but in terms of sufficiency, why couldn't a fact finder say the best evidence of what you did that day is your notes of what you did that day? So there was a lot of testimony at trial over whether... A fact finder doesn't have to believe any of it. But if I could just, there was a lot of testimony at trial that the progress notes were not kept contemporaneously. Right. These are great arguments why the fact finder shouldn't infer from the fact that the progress notes don't mention anything. But that's not a sufficiency argument. That's an argument that you make to a fact finder. And also, there was testimony at trial that the progress notes were not necessarily reflective of the... And again, the fact... Again, that's a great... These are great defense arguments at trial. I'm just not sure they work in a sufficiency context. The fact that there are other explanations that a jury or a fact finder would have accepted. On sufficiency, we assume every single time there's a disagreement between you and the government, they believe the government and disagree with you. That's how sufficiency review works, right? Correct. Okay. So why is that not enough? Because I believe this court needs to look to the testimony of the witness and the testimony of the witness as to what the witness did on that particular day. And the evidence from the case is that she testified consistently that she provided at least two hours of planning each day. Each day? Well, but hold on. That's the other problem. Your brief again and again talks about people's testimony about what they normally do, what they typically do, what they do most of the days. But when it comes to three and four, it's not about what people normally do or mostly do. It's what they did on that day. So again, on a sufficiency standard, I don't know how testimony about what someone normally does has much to do with a sufficiency challenge. I understand your question, Judge, and I understand your concern, but it is the government's burden to prove beyond a reasonable doubt that those services were not provided on those particular days. Why wouldn't they, the government, have proved that? Because the testimony from Bell, for example, was that here's someone who is a full-time elementary school teacher and she simply didn't have time in the view of the district court in the middle of the school day to devote to her second job of helping Mr. Davis. And the testimony, as I understand it, was that she was given standing instructions that were to apply. It didn't matter what day. The customary thing was you just bill two hours in the middle of the day, no matter what, regardless. And this was the modus operandi of the operation, that they were to bill those two hours as a matter of sort of standard practice. It wasn't some days you provide them, other days you don't provide them. It was an across-the-board instruction from this gentleman to the employees that we just, as a matter of course, bill these two hours in the middle of the day. And it is just awkward to see how a full-time elementary school teacher who works pretty much of a full-time day could ever have sort of just taken off in the middle of the day and worked her second job. And the district court found her to be credible. And then you have Mr. Looney who was told to bill midday hours when no children were even present. And that's not a reimbursable expense. And the point is, these instructions to Bill and Looney were not time-dependent. They weren't dependent on a particular day. They were across-the-board. This is what we do. This is our practice. And why isn't the blanket instruction, follow up on Judge Hyten's view, why isn't that sufficient? Well, for Ms. Bell, Your Honor, who was a full-time school teacher, as I've indicated in my briefs, as the record shows, she made clear to Mr. Davis that she was going to perform the necessary hours. And let's turn to the date in question that Ms. Bell was concerned with. In her particular situation, she was tasked with billing five hours a day. Her progress note on that day said four hours of counseling. And then she said that she would regularly get in care coordination of approximately one hour each day. That's the five hours, Judge. She met the five hours under the testimony that was provided at trial, under the records, the progress notes that were provided to DMAS for reimbursement. And so the government simply failed on that account. Now, you mentioned Ms. Loney as well, Judge. On Ms. Loney's count, you have a situation where she didn't specifically testify about anything that happened on that day. And that's where the government fell short. I know you're about, can I ask you a question about willfully, the willfulness requirement? We haven't talked about that aspect of mens rea. That's right. I know. I see I'm out of time. Chief, can I ask? Absolutely. So let's posit that I think you're right that the district court fundamentally misunderstood how willfulness works because I think fundamentally misunderstood how willfulness works. Let's posit that I think you're right about that. I'm not saying I do, but posit for this question that I do. What I don't know what to do is with the district court's alternative finding on JA 398 when the court says, first of all, I conclude the defendant is wrong about willfulness. Let's posit that I agree with you that the court's wrong up until that point. But then the court very clearly says, even if I adopted the defendant's definition of willfulness, I would still find it dissatisfied. What do I do with that? No. And I understand the court's concern and it's a legitimate concern. But the point I try to raise here, Judge, is that the government in presenting its case through its indictment, through its trial brief to the court outlined these issues and did so erroneously. So the judge is predisposed to find in a certain way, to decide in a certain way. And the lens through So I'm not supposed to believe the district judge when they say, even if I applied your standard, I'd still find your client guilty. I'm supposed to assume the district court is not telling the truth when they say that? No, no. But it did so in hindsight. As it was listening to the evidence in the case, as it was assessing what it was hearing throughout the trial, it was viewing that evidence through the lens that the government doesn't need to prove by a focused on here, Judge. And so after the fact, in hindsight, oh yeah, well, even if that was the standard that the government's met that standard. All right. Thank you, Mr. White. We'll hear from the government. Good morning, Your Honors. May it please the court. I see you wore the right side. I did, Your Honor. In a brief moment and a personal dispensation, I sat in this room 15 years ago for a very similar argument. I had no concept that I would be back here. So I'm very gratified to be back. My name is Shea Gibbons and I proudly represent the United States of America. Richard Davis was the owner, CEO, and clinical director of Innovative Family Services. In this role, he signed an enrollment agreement with Medicaid that he would follow the rules. He would follow federal and state law. And despite these Medicaid rules that prohibited billing for transportation, group care coordination, and planning, and documentation of medical records, he instructed his employees to bill for two hours in the middle of the day, no matter what they did. That's fraud. And it violates the... No, it's not actually fraud until they actually bill for time they didn't actually do, right? Yeah. Maybe you're a bad person if you tell people to do that. That's correct, Your Honor. Yes. I'd like to first talk about counts three and counts four and why those are problematic. Am I reading the record correctly that these were standard instructions that were not dependent on what happened here or there, that they were instructions to do this regardless? Yes, Your Honor. That is very clear from the record. I mean, is that the critical question here as to whether we go at this bill by bill, day by day, and take every single billing in order to have a sufficient evidence for any particular bill? We have to go... Every time a bill is submitted, we have to prove beyond a reasonable doubt. Or is it sufficient simply to say, this was a fraudulent scheme and we're not just puffing smoke on that. We've got the evidence for that in the testimony of Bill and Loni that this was a scheme and it was not dependent on any particular day. It wasn't particular on any day because the standard instructions were to do this every day. The question is, is that adequate, sufficient in a case of Medicaid fraud? But isn't that the question here? Your Honor, I think there are multiple layers to that. Ultimately, the question is, are counts three and four proved beyond a reasonable doubt? Those counts are related to a specific date. Yes, Your Honor. And the government did not allege or charge a conspiracy in this case, right? Yes, we did not believe that any of the subordinates... That's why it is important to focus on the dates and not this open, related to Judge Hyten's point, that it may be bad form to say, do this regardless. But if in fact the reality was that on those two dates, notwithstanding those fairly sinister instructions, the counselors in fact complied with their requirements under the law, there's no offense, right? Yes, Your Honor. I agree. So can we take count four? Yes, I would love to start with count four. That's our strongest argument. Okay, so just I want to make sure they billed for three units, right? That's correct. That means someone has to have worked at least five hours. Yes. You agree there is pretty substantial evidence that she billed at least four hours? I do not agree, Your Honor. No? Because the progress notes indicate there were four qualifying hours that day, right? That particular progress note, yes. Okay. So if that were credited, so I'll give you a chance to explain why we don't have to credit that, but if we were to credit that then she needs one more hour, right? Yes. Once we hit five, we're fine. You can bill three units. Yes. Okay, so what's the evidence that the two hours, and I believe they claim two hours of planning. Yes. And then the witness on the stand admits that she didn't do two hours of planning. That's correct. Where's the evidence she didn't, but it doesn't, she doesn't need two, she needs one. Where's the evidence she didn't do one? Well, a couple of things. If you look at the record J.A. 1820, so we put into the record three other progress notes for three other recipients on that specific day where she claimed that same two-hour period, which she didn't have because he was a public school teacher, to four separate clients. So if you just take that hour a day that the defendant claims happened and you spread that four different ways, that's only... Yeah, but maybe she's group, again, this is the Chief's point, like fine, maybe there was fraud about those other people, but we're talking about this count for this one. It could be that she was group billing for the same amount of time for four people and maybe that's okay, maybe it's not okay, but if she actually did it. So, okay, so what again is the evidence? Because again, it doesn't matter that she didn't do two, right? Because claiming to do six when you really did five doesn't matter because if you actually did five, you can bill three units. Yes. Okay, so what's the evidence she didn't do one? So she didn't do one because she split whatever time she devoted to innovative work on that particular day, she split between at least four different people. And she also said that she engaged in non-reimbursable activities, such as documentation of medical records. On that date? Well, not specifically on that date, but during that time. I mean, the whole point is the government has the burden to show what happened on that date. And this court's decision in, I'm not going to say this right, but Joglee, it's a 2015 case. It highlights that in a scheme and artifice to defraud case, such as 1347, it shares similar elements to a conspiracy that instances of a healthcare fraud scheme charged as part of a scheme and artifice. For example, it's not 404B evidence to talk about other manifestations of a healthcare fraud scheme outside of those charged in the indictment. Is there any evidence anywhere in this entire record, and I'm well aware that the government has the ultimate burden of proving beyond a reasonable doubt, but you have a trial, you have even with that burden of proof, you still have evidence coming out on both sides. And is there any specific evidence that she actually, that Bell actually did perform two hours of work on the two days in question? There is no evidence that Ms. Bell did any particular work for Innovative during that midday period. And we're not talking about the after school period where actual services were rendered. Why doesn't that get that backwards? Don't you have to show, the government have to show that she didn't perform two hours of work? The way these, I specialize in healthcare fraud, and then the way these typically work is that- I'm just thinking of criminal law 101. This is like standard defense counsel opening statement and closing argument rhetoric. I don't have to prove a single thing. I don't have to say a single thing. The assumption is that what my client has done is legal unless and until the government proves that it's not legal. This is standard defense counsel rhetoric, which also happens to be legally accurate. So for the chief's point, why does she have to prove that she did bill? Wasn't it your obligation to prove that she didn't? And here's where we get back to the scheme and artifice. Can you answer that? Is that right? Is he correct? Well, he's correct. Yes. The point is that the scheme and artifice and specifically getting back to Judge Wilkinson's point, the uniformity of the instructions to bill for this time, no matter what, makes the regular practice more and more relevant to what happened specifically on May 9th, 2018 for count four and April 30th, excuse me, 2018. It seems like you're arguing like this is propensity evidence. It might've happened on some other dates that are irrelevant to the count. And so we ought to infer from that, that criminal misconduct occurred on this date. I don't believe it's propensity evidence. Again, going back to the Bejogli case and the scheme and artifice, that there's a scheme and artifice that enforces the same standards every single day. This isn't a case where there was some variation in how these two hours were billed. These two hours were billed for every single employee, every single day. Absolutely. We'll grant you that. But then the question is, were those two hours that were billed on that date, did that amount to fraud because the hours actually weren't worked? Well, and then we get to sufficiency review and the standard with all inferences in favor of the government, the fact finder hearing all of this evidence ruled that five hours of services weren't rendered because Ms. Bell was a school teacher and could not have performed these midday hours to the extent claimed. But it doesn't shift the burden of proof, does it? Of course the government has the burden of proof, but then they're shifting responsibilities. And I mean, the title seven case is a classic example, even though it's a civil case, but they're shifting responsibilities within that ultimate burden of proof. And that doesn't result in nullifying the government's burden ultimately to prove the crime beyond a reasonable doubt. The government did put on the evidence that these were standard instructions. And as a matter of common sense, it would be at least to the defense's advantage to put in evidence and say, well, they may have been standard instructions, but they really weren't at all. And here are instances where someone, where she has testified, yes, I actually worked. I took time off from the school. I went off and performed these two hours of work. Somewhere in this entire record, one would expect it to take cognizance of the fact that it is to the defendant's advantage to say, well, you may have these standard instructions, but they're not standard at all. And on this particular day, and on this particular day, she actually performed the work. And if that's the case, then we get into a day by day by day, closer to a day by day analysis. But was that kind of testimony ever put on? On this day, I actually, on any day, did she testify that she came in and performed two hours of work? She did not testify to that. She said that to the extent she had time in her school day to perform any work for her second job. And all I would have taken was some testimony that just, well, you know, occasionally we did come in and perform that work, or I know that, you know, notwithstanding, there were days when we came in and we performed those work. But that's not there in this record, is it? Both Ms. Loney and Ms. Bell testify about their practice. And the practical import of these health care fraud cases with thousands or tens of thousands of false claims or particular... You're not answering my question. I'm asking you whether there was testimony in the record that she actually did on some days come in and perform the two hours of work. There's no evidence one way or the other, because she doesn't remember this particular day. Okay, so you have the standard instruction and it's not contradicted, right? Yes, Your Honor. And then she has a consistent practice, Ms. Bell and Ms. Loney have consistent practices. You have a consistent practice and you would expect some testimony as to variance from the specific practice. And it doesn't shift the burden of proof to note that the defendant can put on to his own advantage, significant advantage, that there was some variation somewhere one day, one day out there when somebody came in and performed the two hours of work. And then we move from the systemic perspective into a day-by-day perspective. But there wasn't... As I read the record, this was a standard invariable practice. And I don't see that that was put into dispute. Yes, Your Honor. So we believe, to put a point on this, that the district court justifiably relied on evidence both of consistent instructions from Mr. Davis and consistent practices by Ms. Loney and Ms. Bell to prove that on April 30th, 2018 and on May 9th, 2018, that they did not perform these services as described in the medical record. So can I take you to the wealth on this question? Yes. Okay. So I want to do the that the district court said, even if I followed his standard, I would still convict. And I think that's a serious problem for them. It seems to me, having read Brian again this morning, that the district court was fundamentally deeply confused about what willfulness means. And I don't understand that. Would you like to try to convince me why the district court wasn't? Brian literally says, and when used in criminal statutes, willfulness means knowledge that your conduct is unlawful or a bad purpose. And then the district court goes on a whole little digression that says sometimes willfulness does not mean what Brian versus United States says very clearly was what willfulness means in criminal statutes. Well, if you look right under that section, there's a footnote. Yeah. The footnote that says sometimes it's construed to mean this, but the district court then extrapolates that to say that in criminal cases, it can mean all those things. Except if you look above the line and Brian, they say again and again and again, and again in federal criminal statutes, willfulness means bad purpose or knowledge of illegality. Am I right? That that's what Brian says over and over again is what willfulness means. Yes, your honor. And I will say that this court in RSM and in Blankenship has extended, has used footnote 12 language in criminal cases to say that it's not, or excuse me, it's not just a bad purpose. It's not limited to a bad purpose. That strikes me as an extremely bizarre reading of what Brian says. The, the, the, the footnote. I don't read that footnote is saying that's how we do criminals. The footnote is attended to a sentence where justice Steven says like willfulness can be used to mean a lot of things footnote. Here's some of the things that willfulness has been used to mean, but above the line, he says in federal criminal statutes, the thing that willfulness means is knowledge of illegality or bad purpose, right? Yes. And that's exactly what Brian says above the line and this court. And again, in RSM Inc and Blankenship. Well, then the district court, we've also, but we've also read Brian to say what Brian says. And then the district court seems to think that it doesn't have to follow what we've said because it thinks it's inconsistent with Brian. That was also to me, a very confusing footnote in the district court's opinion. This has been an open question. There's certainly a lot of ambiguity as to how this court and other courts, and the same decision from the sixth circuit is emblematic of this, that the willful jury instructions and the understanding of what willfulness means in criminal statutes, specifically in 1347. It's not clear. You've got all these words flowing around, specific intent, willfulness, purpose, of all of those words that are sort of floating around as to the men's rave. What do you think as to the men's rave, what state of mind did the district's decision, district court's decision rest upon? Did it rest upon willfulness, purpose, knowledge? What was it? It was willfulness. In terms of the definition of willfulness, the district court said he acted with a bad purpose consistent with- Well, that was its alternative finding. Its first finding was that he was reckless. He was super negligent. And let's posit that I don't think that any of those are willful. And that's fine. That doesn't change the result in this case. The government's recommendation to this court is to follow the sixth circuit's decision in seeing and apply Brian above the line language or below the line language and clarify that it means a bad purpose or knowledge that a person is acting unlawfully. So overall, Brian says knowledge that you're violating the law. I agree it says bad purpose a few times, but the thing that it primarily says is that the classic definition of willful in a federal criminal statute is that you have to know that what you're doing is illegal. You don't necessarily have to know what statute you're violating. And I think the amendment to this statute makes clear. You don't have to know that you're violating this provision of the Medicaid Act, but you do have to know that what you're doing is illegal, right? What do you understand the relationship between knowledge of illegality and bad purpose? I guess I don't really, I will say that part of Brian confuses me a little bit because I don't understand the relationship between those two things. Certainly, Your Honor. In addressing these issues, I feel there's a large amount of ambiguity between the definition of knowingly and willfully. So knowingly, when we get to the Dixon case and understanding the facts of the case, understanding what is going on, whether this is intentional conduct or accidental conduct, we believe that the defendant's proffered standard of knowing the minutia of every claim and thousands of health care fraud claims is just ludicrous. He set up the scheme, and in fact, Ms. Bell testified that he was reviewing progress notes. He was in the loop. So regardless of the standard applied, knowingly satisfied. Is it sufficient that you simply know the facts? In other words, is it sufficient that in a case of fraudulent misconduct that you simply know the facts underlying the fraud? You know that you bill for services that were not reimbursable. You know that you bill for services that were never performed. And if you know that, the statute requires the finding of knowledge or willfulness, as I understand it. But if you know that you bill for services not performed or that were not reimbursement, why isn't that sufficient? In men's ray terms, I mean, you know, we can have the angels dancing on the head of a pen here. We can get into specific intent and the rest. But if you know, not necessarily what the law is, but if you know, which is in men's ray, what the facts were, if you know what you did, and that's what the law requires. And this person, he knew what he did. He knew that what he was billing, he knew he was misrepresenting things. And we were saying, well, there was a problem with men's ray here, but there's not a problem if you know that you're committing fraud. Do you agree with me that this statute doesn't say knowingly or willfully? Yes, knowingly and willfully. Yes. So we believe knowing the facts of what you're doing, intentional versus accidental conduct, that's knowingly. Let me talk briefly about willfully. The defendant's proffered standard is that you have to use the word fraud in instructing your subordinates to do things. And if you don't use the word fraud, you're not, you haven't acted willfully. That's my reading of the defendant's position. And that just simply cannot be the case. He certainly didn't use the word fraud. There's no evidence that he said, we're going to do fraud together. Let's commit fraud. But his actions in being under an obligation to follow the rules and telling employees to bill two hours, no matter what. The Medicaid program, it's just the expenses of increasing leaps and bounds and fraud in Medicaid reporting is absolutely rampant. It's an endemic problem, Medicaid fraud. I have some sympathy for people who are trying to figure out these Medicaid regulations because they're so, you know, they're Byzantine in the extreme. And it takes me a long time to figure them out. And if I ever do, and it would seem to me that this gentleman would, you know, that anybody would have a hard time figuring out sometimes when Medicaid. Is this a case for civil sanctions? You chose to go the criminal route. Would an alternative path have been available to you where you would just seek return of funds or some kind of civil remedy here? Where does the government, why does this case fall on the criminal side of the ledger rather than on the civil side? Because you do have the option of bringing a civil action. Your Honor, I see I'm out of time. May I respond? Absolutely. Yes, certainly there are civil and administrative options that could have been pursued. And the instruction to build two hours no matter what, and the instruction to build for transportation, documentation, group care coordination, and group planning. If this was a reasoned decision and a good faith interpretation of the Medicaid rules, we wouldn't see instructions to build for things that are plainly prohibited. And that's why he was convicted of counts three and four, and that's why his conviction should be affirmed. Couldn't somebody get confused about whether planning, for example, was reimbursable? You have this quilt work of some kinds of expenses that were reimbursable and others were not. Clearly, when no services are performed, those are not reimbursable. But where some services are performed, it's a closer question sometimes as to what's reimbursable and what's not. And part of the confusion here, maybe it was whether planning exercises were reimbursed. So the defendant would love for this case to be only about group planning. Group planning must be acceptable for these claims to be permissible. But we can win even if we show that he billed for group care coordination, which everyone agrees is not allowed, transportation, and documentation. So if you look at just those plainly impermissible things, there's still evidence in the record to show that counts three and four were fraudulent and false. All right, thank you. Thank you, Your Honor. First is about the scheme or artifice to defraud. And as Judge Hyte, as you pointed out, as long as we can show five hours of reimbursable services for the three units that were billed to Medicaid, then there is no fraud here. Witnesses testified as to that five-hour threshold through Ms. Bell, Joint Appendix 577, Ms. Carter, Joint Appendix 665, Ms. Loney, Joint Appendix 749, Ms. Mazik, 783, Mr. Martin, 1231. All of these witnesses provided testimony to the court that it was the practice of the counselors at this particular place, at IFS, that you have at least two hours of planning and at least three hours of counseling for each of the students, for each of the patients involved. Second, the government wants this court to impose liability and culpability on Mr. Davis for every specific count in this case, for every specific claim that was submitted for reimbursement to DMAS. Well, if they really wanted that, they could have charged this as a conspiracy and they didn't. And finally, Mr. Davis, there's been a lot of talk about what he instructed people to do and what his modus operandi was for this business. Let's be clear, he never instructed any employee to commit fraud, never instructed any employee to submit a fraudulent claim. Wait, hold on. Write down two hours a day no matter what, at least again from a sufficiency perspective. I don't know why a fact finder can't infer whether you actually work two hours or not. Write down two hours. That is at least a permissible interpretation of the statement. Write down two hours no matter what. Isn't that at least permissible interpretation of that? Judge, I understand the concern there. No, that's a direct question. Do you think that's a permissible, at least a permiss... If I were to say to you every single day, write down two hours no matter what, do you think it is a permissible interpretation of what I've just told you, that I said, even if you didn't actually do two hours, write down two hours? Clearly the way that is phrased, that is not permissible. And I concede that point. But the question is, to what extent did he really... I mean, there are bosses out there who tell their employees to max bill. And that was another term that's been used in this case, maximum billing. And I know in law firms, there are a lot of folks, partners who are telling their associates to max bill. It doesn't make it fraudulent. I think there was some hyperbole. I understand your position, Mr. Wagner. In fact, there was evidence, I think, from Ms. Bell that I believe they asked her, what would have happened if Mr. Davis had found out that you were actually billing time for which you were not being compensated? And she said she would have been fired. But given you that, even giving you that, what is wrong with a fact finder crediting Judge Hyten's version of the evidence? I mean, you conceded that that would be improper, unlawful. So what was wrong with Judge Gibney going with that theory of the case? Well, because the evidence, at least on the two specific counts, didn't bear that out. There wasn't proof that those two hours were not performed, at least by Ms. Loney, and that in the case of Ms. Bell, that that one hour was not performed. The one hour that was required to reach the five-hour threshold. I see my time is up. All right. Thank you. I'm fine. Thank you, Mr. Wagner. Thank you. Sure, we can do whatever you'd like. I'm fine. All right. Thank you, Mr. Wagner. Welcome down and I'll greet you and then move on to our second case. Thank you.
judges: Albert Diaz, J. Harvie Wilkinson III, Toby J. Heytens